```
                                                    U.S. DISTRICT COURT
                                                    DISTRICT OF N.H.
         UNITED STATES DISTRICT COURT                     FILED
         DISTRICT OF NEW HAMPSHIRE
                                                    2013 JAN 22  P 3: 32
```

UNITED STATES OF AMERICA

v.                                          No. 1:12-cr-00069-01-PB

NAZAR LOPUSHANSKY

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John P. Kacavas, the United States Attorney for the District of New Hampshire, and the defendant, Nazar Lopushansky, and the defendant's attorney, Jonathan Saxe, Esq., enter into the following Plea Agreement:

1. The Plea and The Offense.

The defendant agrees to plead guilty to the mail fraud offenses that are charged in Counts 1 through 6 of the Indictment. In exchange for the defendant's guilty pleas, the government agrees to recommend that the defendant be sentenced to the minimum period of incarceration for the advisory guideline sentencing range as determined by the sentencing court.

   2. The Statute and Elements of the Offense.

Title 18, United States Code, Section 1341 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [and] for the purpose of executing such scheme or artifice or attempting to so to do . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . any such matter or thing, shall be [guilty of an offense].

The defendant understands that the offense of mail fraud has the following elements, each of which the government would be required to prove beyond a reasonable doubt at trial:

> First, the defendant engaged in a scheme and artifice to defraud or to obtain money by false and fraudulent pretenses, representations or promises;

> Second, the defendant knowingly and willfully participated in the scheme with the knowledge of its fraudulent nature and a specific intent to defraud; and

> Third, in execution of the scheme, the defendant used or caused the use of the mails as specified in the Indictment.[1]

3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove the following facts and those facts would establish the elements of the offense beyond a reasonable doubt:

Performance and Payment Bonds

In general, a construction performance bond is a guarantee to the owner of a construction project ("the obligee") that the obligee's contractor will complete a contract. If the contractor fails to complete the contract, the obligee is permitted to file a claim with the bond company to require the bond company to pay for the contract to be completed.

Similarly, a construction payment bond is a guarantee to the obligee that the contractor will pay for the labor and materials that are required to complete the contract. If the contractor fails to pay any of those expenses, an unpaid vendor or an unpaid worker can file a claim with the bond company to recover their losses.

To acquire a performance or payment bond, a contractor must pay a premium to a bond company.

If a bond company pays a claim, it is entitled to recover the amount of the expense from the contractor to whom the bond was issued. For that reason, a bond company's evaluation of the risk associated with a bond substantially depends on the financial condition of the contractor seeking to purchase it.

---

[1] *United States v. Hebshie*, 549 F.3d 30, 35-36 (1st Cir. 2008).

Engelwood Construction Co., Inc.

The defendant owned and managed a small financially distressed construction company, Engelwood Construction, Co. Inc. ("Engelwood") from an office in Manchester, New Hampshire. At the defendant's direction, Engelwood's office manager recorded Engelwood's financial transactions in a general ledger.

On October 30, 2008, the defendant opened a checking account for Engelwood at Citizens Bank ("the Citizens account") with an initial deposit of $450. The next day, $400 was withdrawn from the Citizens account. During the next year, no money was deposited to or withdrawn from the Citizens account, other than a $6.00 monthly service fee.

In January 2009, the defendant directed Engelwood's office manager to add an additional $450,000 to the general ledger as "additional capital." During the same month, the defendant hired a Certified Public Accountant, Linda Smith, to prepare a 2008-year-end financial statement ("the 2008 statement") for Engelwood. The defendant told Smith that he intended to use the 2008 statement to purchase bonds for Englewood. He gave Smith a copy of Engelwood's general ledger and other documents related to Engelwood's financial condition. At Smith's request, the defendant also signed a document in which he acknowledged that Smith had been retained to "review" Engelwood's financial condition, not a more rigorous audit of its financial condition.

As Smith prepared the 2008 financial statement, she asked the defendant to provide additional information related to the $450,000 general ledger entry. In response, the defendant provided two fraudulent documents: a "Citizens Bank Customer Receipt" for a fictitious $450,000 deposit to the Citizens account on October 30, 2008, and an "Account History" for the Citizens account that falsely stated that the month-end balances for the Citizens account exceeded $450,000 every month from October 2008 to January 2009.

Smith presented the 2008 statement to the defendant near the end of February 2009. Due to the bogus "Citizens Bank Customer Receipt" and the bogus "Account History," the statement falsely reported that Engelwood possessed "Cash Assets" totaling $476,951 as of December 31, 2008. Compounding the lie, the 2008 statement also falsely reports that the cash "consists of deposits on account in financial institutions."

The Legislative Office Building Project

Substantial repairs to buildings that are owned by the State of New Hampshire are made by private contractors under contracts that are awarded by the New Hampshire Department of Administrative Services, Bureau of Public Works ("BPW"). Only "pre-qualified" contractors are permitted to bid on the contracts. Pre-qualification applications are submitted to the New Hampshire Department of Transportation, Department of Finance and Contracts ("DOT").

The applications require contractors to provide information about their current financial condition and other information related to their business activities. Contractors seeking authority

to bid on state contracts valued between $500,000 to $4 million are required to provide financial statements that are *reviewed* by a CPA. Contractors seeking authority to bid on state contracts valued at more than $4,000,000 are required to provide financial statements that are *audited* by a CPA.

As a general rule, pre-qualification applications submitted by contractors with a proven ability to perform certain types of work are approved if the contractors possess positive working capital. Applications that are submitted by contractors with negative working capital are usually disapproved. The state's contracting rules require the BPW to award contracts to the contractor that submits the lowest bid for a project if the contractor is able to purchase a bond for the project.

Engelwood's 2009 pre-qualification application was signed and submitted by the defendant to the DOT on April 13, 2009. The application falsely reported that Englewood possessed cash asset totaling $476,951. A copy of the 2008 statement was also submitted to the DOT because the defendant was seeking authority to bid on contracts worth up to $4 million. The next day, April 14, the DOT's Prequalification Administrator, Deborah Weil used the services of the United States Postal Service ("USPS") to deliver a letter to Engelwood's office. The letter stated that Engelwood was qualified to bid on state contracts worth up to $4 million.

In mid-July 2009, Lopushansky provided a copy of the 2008 statement to an insurance agency in Woburn, Massachusetts, USI Insurance Company. On July 16, one of the USI's agent's, Michael Regan, sent a copy of the 2008 statement to a bond company in Hermitage, Tennessee, Bond Safeguard.

Relying on the information contained in the 2008 statement, Bond Safeguard's vice president, Greg Semrow, told Regan that Bond Safeguard would consider, on a case by case basis, issuing bonds valued up to $1 million, and $2.5 million in the aggregate, to Engelwood. An experienced and discerning bond underwriter, Semrow would not have issued a bond for any value to Engelwood if he knew the 2008 statement overvalued Engelwood's cash assets by $450,000.

On July 16, 2009, the BPW solicited bids on a contract to replace the slate roof on the Legislative Office Building in Concord, New Hampshire. On July 30, 2009, the defendant submitted a bid to replace the roof for $492,323.

On July 31, 2009, the BPW's Administrator, Mark Nogueira, used the services of the United States Postal Service to deliver a letter to Engelwood's office. The letter stated that the contract to replace the slate roof on the Legislative Office Building had been awarded to Engelwood, subject to approval from the Governor's Executive Council and Engelwood's acquisition of performance and payment bonds for the project. Significantly, the contract prohibited Engelwood from using subcontracted employees on the project without prior approval from the BPW.

On August 20, 2009, Nogueira used the service of the USPS to mail another letter to Engelwood. The letter stated that the BPW's decision to award the contract to Engelwood had been approved by the Governor's Executive Council.

The contract was terminated by Nogueira on October 29, 2009, in part, because the defendant attempted to use subcontracted workers on the project without obtaining the BPW's approval. As a result, another contractor was hired to complete the project and Bond Safeguard suffered a financial loss.

### Town of Moultonborough Project

In July 2009, the Town of Moultonborough, New Hampshire solicited bids on a contract to repair the roof on its Town Hall. Engelwood's qualifications to perform that work were described in a document that was hand delivered to the Town on August 24, 2009. On September 3, 2009, the Town used the services of the USPS to deliver a letter to Engelwood's office. The letter stated that Engelwood was qualified to bid on the contract.

On September 24, 2009, Engelwood submitted a $68,900 bid on the contract. On October 2, 2009, the Town used the services of the USPS to deliver a letter to Engelwood's office. The letter stated that the contract to repair the Town Hall's roof had been awarded to Englewood.

On October 3 or 4, 2009, the contract was expanded to include additional repairs to the roof. Accordingly, on October 5, 2009, the Town's Administrator, Carter Terenzini, used the services of the USPS to deliver another letter to Engelwood's office. The letter stated that the value of the contract had been increased to $91,650.

Acting with Semrow's approval, Regan issued a bond for the project on October 7, 2009. In 2010, Bond Safeguard paid three bond claims submitted in connection with this project because Engelwood failed to repair the roof in accordance with the contract.

### Defendant's Statements to a United States Postal Inspector

On May 15, 2012, the defendant met with United States Postal Inspector Dan Forristall. During the meeting, the defendant signed a written waiver of his right to have counsel present. He also admitted that he provided the bogus "Citizens Bank Customer Receipt" and the bogus "Citizens Bank Account History" to Smith because he needed an inflated financial statement to acquire performance and payment bonds for Engelwood.

4. Penalties, Special Assessment and Restitution.

The defendant understands that the maximum penalties for the offense are:

A.  A twenty year term of imprisonment;

B.  A fine of $250,000, or an amount that is equal to twice the gross gain or twice the gross loss that was caused by the offenses, whichever is greater (18 U.S.C. §§ 3571(b)(3) and (d)); and

    C.    A three year term of supervised release. 18 U.S.C. §§ 3559(a)(3) and 3583(b)(2). The defendant understands that his failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring him to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release.

The defendant also understands that he will be required to pay a special assessment of $600 ($100 for each count of conviction) at or before the time of sentencing; and that the Court may order him to pay restitution to the victims of the offense, pursuant to 18 U.S.C. §§ 3663 or 3663A.

5. <u>Sentencing and Application of the Sentencing Guidelines</u>.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that he has no right to withdraw his guilty plea if the applicable advisory guideline range or his sentence is other than he anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

    A. Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

    B. Respond to questions from the Court;

    C. Correct any inaccuracies in the pre-sentence report;

    D. Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range with the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. Sentencing Stipulations and Agreements.

Pursuant to Fed. R. Crim. 11(c)(1)(B), the parties agree that the government: (a) will not argue that the amount of the loss for purposes of U.S.S.G. § 2B1.1 is greater than $300,000, and (b) will recommend that the defendant be sentenced to minimum period of incarceration for the applicable guideline sentencing range as determined by the sentencing court.

The defendant understands that the Court is not bound by the foregoing agreements and, with the aid of a pre-sentence report, the court will determine the facts relevant to sentencing. The defendant also understands that if the Court does not accept any or all those agreements, such rejection by the Court will not be a basis for the defendant to withdraw his guilty plea.

The defendant understands that the government may argue that other sentencing enhancements should be applied to this case, and he is free to object to them.

The parties are free to make recommendations with respect to fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. Acceptance of Responsibility.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility

for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

> A. Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;
>
> B. Challenges the United States' offer of proof at any time after the plea is entered;
>
> C. Denies involvement in the offense;
>
> D. Gives conflicting statements about his involvement in the offense or is untruthful with the Court, the United States or the Probation Office;
>
> E. Fails to give complete and accurate information about his financial status to the Probation Office;
>
> F. Obstructs or attempts to obstruct justice, prior to sentencing;
>
> G. Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;
>
> H. Fails to appear in court as required;
>
> I. After signing this Plea Agreement, engages in additional criminal conduct; or
>
> J. Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

A. To plead not guilty or to maintain that plea if it has already been made;

B. To be tried by a jury and, at that trial, to the assistance of counsel;

C. To confront and cross-examine witnesses;

D. Not to be compelled to provide testimony that may incriminate him; and

E. To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9. <u>Acknowledgment of Guilt; Voluntariness of Plea</u>.

The defendant understands and acknowledges that he:

A. Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B. Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C. Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D. Understands the nature of the offenses to which he is pleading guilty, including the penalties provided by law; and

E. Is completely satisfied with the representation and advice received from his undersigned attorney.

10. <u>Scope of Agreement</u>.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant. In that regard, the defendant and the government agree that the federal civil tax liability that stems from the conduct underlying the offenses is a matter defendant will separately address with the Internal Revenue Service.

11. <u>Collateral Consequences</u>.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the indictment in this case. The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13. <u>Waivers</u>.

    A. Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea

Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel in the negotiation of this Plea Agreement or at the sentencing hearing.

B. Collateral Review

The defendants understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if it falls within, or lower than, the guideline range as determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waive of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel in the negotiation of the Plea, Plea Agreement or the sentencing hearing. The defendant's waiver of his right collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated by in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea

Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

    D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government to pursue an appeal that is authorized by law.

14. <u>No Other Promises</u>.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. <u>Final Binding Agreement</u>.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. <u>Agreement Provisions Not Severable</u>.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN P. KACAVAS
United States Attorney

Date: 1/22/13          By: /s/ Robert M. Kinsella
                            Robert M. Kinsella
                            Assistant United States Attorney
                            Bar No. 273315
                            53 Pleasant St., 4th Floor
                            Concord, NH 03301
                            (603) 225-1552
                            robert.kinsella@usdoj.gov

The defendant, Nazar Lopushansky, certifies that he has read this 14-page Plea Agreement and that he fully understands and accepts its terms.

Date: 01-18-13                /s/ Nazar Lopushansky
                              Nazar Lopushansky, Defendant

I have read and explained this 14-page Plea Agreement to the defendant, Nazar Lopushansky, and he has advised us that he understands and accepts its terms.

Date: 1/18/13                 /s/ Jonathan Saxe
                              Jonathan Saxe, Esq.
                              Attorney for Nazar Lopushansky